The State v. Martin.

THE STATE v. MARTIN, *Appellant.*

Division Two, November 5, 1894.

1. **Criminal Law**: MURDER: MANSLAUGHTER: PROVOCATION. Mere words of reproach, however grievous, unaccompanied by an assault or battery, do not constitute such a provocation as to reduce a homicide from murder to manslaughter.

2. ———: ———: ———: ———: INSTRUCTION. Where there is no evidence of a provocation caused by actual violence on the part of the deceased, it is not error for the court to refuse to submit to the jury the question of such provocation in connection with the provocation arising from the application by the deceased of opprobrious epithets to the accused.

3. **Criminal Practice**: WEIGHING EVIDENCE: INSTRUCTION. The trial court may instruct the jury as to the rule for weighing testimony.

4. ———: WILLFUL FALSE TESTIMONY: INSTRUCTION. Where, on a trial for murder, the contradiction in the testimony of two witnesses is sharp and clear and not concerning a matter as to which the witnesses might honestly differ, it is proper to instruct the jury that if they conclude that any witness has sworn willfully falsely as to any material matter involved in the trial they may reject the whole or any part of the testimony of such witness.

5. ———: MURDER: REASONABLE DOUBT: INSTRUCTIONS. It is proper, on a trial for murder, to instruct the jury that they must find affirmatively all the elements of either degree of the crime beyond a reasonable doubt before they can convict of either of such degrees.

6. ———: DISCREDITING WITNESS: EVIDENCE. A witness, for the purpose of discrediting him, may be asked how often he has been in the county jail, and it is unnecessary in such case to produce the record of conviction.

7. ———: EVIDENCE: NON-REVERSIBLE ERROR. The mere refusal of the trial court to permit a witness to answer a question is not sufficient ground for reversing the judgment; it should be shown what the party offering the witness desired to prove.

8. ———: ———. Where two persons are jointly indicted and a severance is granted, it is not error to refuse to permit the defendant testifying in his own behalf to tell what the other said to him in reference to the crime, it not being a part of the *res gestæ* nor in contradiction of the testimony of any of the state's witnesses.

The State v. Martin.

9. ———: HOMICIDE: EVIDENCE: RES GESTÆ. Deceased was walking on the street when stabbed by the defendant, and he then called for the police and said he was "fainting," "gone," "catch me." He was carried into a saloon, and a witness ran for a doctor and returned without delay, and an officer who had arrived by the time the witness had returned asked deceased "Who did it?" and the latter answered, "Two niggers; one a little yellow fellow." No suggestion was made to the dying man. *Held,* that such statement was part of the *res gestæ,* and as such properly admissible in evidence.

10. ———: EVIDENCE: WAIVER. A party making no objection on the trial to the admission of certain testimony, can not, on appeal, take advantage of its incompetency.

*Appeal from Jackson Criminal Court.*—HON. JOHN W. WOFFORD, Judge.

AFFIRMED.

*Thos. N. Williams* and *T. R. Stockton* for appellant.

(1) Lyle, being a codefendant, was not a competent witness against defendant. R. S. 1889, sec. 4217; *State v. Martin,* 74 Mo. 547. (2) The court erred in admitting the evidence as to what Stillwell said as to the person who cut him. *Rex v. Benderfield,* 14 Cox Crim. Cases; *Railroad v. Becker,* 128 Ill. 545; *Adams v. Railroad,* 74 Mo. 553; *Railroad v. Mara,* 26 Ohio St. 185; *People v. Ah Sin,* 60 Cal. 85; *Denton v. State,* 1 Swan (Tenn.), 279; Roscoe's Criminal Evidence, page 26; *Walde v. Railroad,* 95 N. Y. 274; *People v. Murphy,* 101 N. Y. 126. (3) It was error to sustain the state's objection to question to defendant as a witness: "State whether or not Lyle said anything to you as to what he had done?" Also, "If this knife was found in your mother's house, do you know how it got there?" (4) The court erred in overruling the defendant's objection to question to his witness Washington on cross-examination: "I will ask you how many times you have

been in jail on a sentence for crime?" This question was clearly incompetent—the record was the best evidence. *State v. Douglass*, 81 Mo. 232; *State v. McGraw*, 74 Mo. 110; *State v. Rugan*, 68 Mo. 214; *State v. Lewis*, 80 Mo. 110; *State v. Brent*, 100 Mo. 531; 1 Greenleaf on Evidence, sec. 457. (5) The court should have instructed on manslaughter. "If there is even slight evidence that the offense committed may have been of a lower degree than the one charged, it is the duty of the court to give the law of such inferior degree." *State v. Evans*, 36 Kan. 497; Bishop's Crim. Proc., sec. 980; 3 Greenleaf [7 Ed.], sec. 122; 2 Bishop on Criminal Law [3 Ed.], secs. 725 and 727 and note 4 to sec. 728.

*R. F. Walker*, Attorney General, *Morton Jourdan*, Assistant Attorney General, and *Marcy K. Brown*, Prosecuting Attorney, for the state.

(1) The testimony of Willets, as to the remark made by Stillwell, after he was taken to the saloon, was admitted as part of the *res gestæ*. The rule of the *res gestæ* admits declarations made under the impulse of the occasion, though somewhat separated in time and place, if so woven into it by the circumstances as to receive credit from it. Abbott's Trial Brief, sec. 628; Wharton on Evidence, sec. 259; *State v. Gabriel*, 88 Mo. 631; *Henry v. Sneed*, 99 Mo. 421. (2) The declaration in question was made by the deceased contemporaneously, or nearly so, with the main event, in consequence of which he died, and was as to the cause of that event, and between the event and the declaration were such connecting circumstances as are held sufficient. The facts as to this declaration are very similar to those in *Com. v. Pike*, 3 Cushing, 181, a case which was cited with approval in *Brownell v. Rail-*

*road*, 47 Mo. 239; *State v. Sloan*, 47 Mo. 604; *Harriman v. Stowe*, 57 Mo. 93; *Entwhistle v. Feighner*, 60 Mo. 215. (3) Instruction number 7, in connection with number 5, correctly and fully declares the law on the use by one assaulted of words of reproach or epithets, toward his assailant prior to the assault. *State v. Elliott, supra; State v. Gee, supra; State v. Starr*, 38 Mo. 271; *State v. Brown*, 64 Mo. 373. (4) The act of "pushing," testified to by defendant, was not done by Stillwell, who "pushed" Lyle, not Martin. There was no evidence of a provocation to passion by personal violence—the kind of provocation necessary to reduce the killing to manslaughter. *State v. Starr, supra; State v. Bulling*, 105 Mo. 221; *State v. Wilson*, 98 Mo. 449; *State v. Talmage*, 107 Mo. 571; *State v. Ellis*, 74 Mo. 217; *State v. Howard*, 102 Mo. 147. (5) No instructions were given on manslaughter, and none should have been given. If the jury believed defendant, he was innocent. Under no testimony whatever was there a case of manslaughter against the defendant. *State v. Talbott*, 73 Mo. 347; *State v. Wilson*, 88 Mo. 19; *State v. Terrell*, 97 Mo. 107; *State v. Turlington*, 102 Mo. 660; *State v. Harvey*, 95 Mo. 455. (6) The verdict was warranted by the evidence.

GANTT, P. J.—At the September term, 1893, of the criminal court of Jackson county, at Kansas City, Philip Martin and Frank Lyle were jointly indicted for the murder of Eli Stillwell, by stabbing, on July 4, 1893. A severance was granted and the defendant herein, Philip Martin, was put upon his trial and the jury returned a verdict of murder in the first degree against him.

The defendant is a young negro man. Eli Stillwell was a white man, day laborer, and was married. He resided with his family at Seventeenth and Vine streets,

Kansas City. On the fourth day of July, 1893, Stillwell had been drinking until he was perceptibly intoxicated, though not enough so to prevent his walking. About 10 o'clock on the night of that day he met his brother-in-law, Charles Stewart, who had come from Sibley, and together they started for Stillwell's home, walking east on Eighteenth street. When they reached a point near Harrison street, they met the defendant Martin and his codefendant Lyle, another negro man, going in the opposite direction from a negro picnic in the neighborhood of Eighteenth and Grove streets. Stillwell and Stewart were walking together abreast, going east, and Martin and Lyle abreast, going west. The parties were wholly unacquainted with each other. The sidewalk was about twelve feet wide, affording ample opportunity for the passage of both parties, but when Martin and Lyle came within four or five feet of the white men they threw themselves shoulder to shoulder and pushed themselves between Stillwell and Stewart with such force that it shoved Stewart out toward the street and Stillwell in toward the buildings on the inside of the walk. The two negroes passed on about ten feet, when Stillwell, who had been staggered by the shoving, said "don't shove me" or "don't push me."

As if expecting some protest, the two negroes immediately halted and turned about, and the defendant Martin commanded Stillwell "to move on," and as Stillwell did not obey this order promptly, advanced on him, as the sequel shows, with an open knife in his hand, and, without further provocation, stabbed him with the knife, the blade of which penetrated the left breast, cutting the arch of the aorta, and inflicting a wound from which Stillwell died that night. Either Martin or Lyle then attacked Stewart also, and he ran across the street to avoid them. Stillwell immediately

The State v. Martin.

called for the police, and ran or walked a few feet and fell down, exclaiming, "*I'm fainting*," "*I am gone*," "Catch me." His cries attracted several persons and he was carried into a saloon near by, and a physician sent for, who resided a block and a half away, but he declined to come, either for the reason that it was too late, or he was sick. He was at once taken into the saloon, and while yet bleeding profusely, and not exceeding five minutes, an officer arrived and inquired of Stillwell, "Do you know who did it?" and he answered "Yes; two niggers; one a little yellow fellow."

After stabbing Stillwell, the defendant Martin and his codefendant Lyle resumed their journey west, together. As they moved on, Martin, the defendant, was heard to say, "I fixed him," and further down the street Martin showed Lyle the knife with which the stabbing was done. It is of the kind the negroes of that city call "a switch," and, it seems in very general use among them.

The defendant Martin was arrested next morning at his home and the knife, with the handle and blade both still fresh with blood, was found in his house. After defendant was confined in his cell in the city prison one of his fellow-prisoners inquired if he was not sorry he did that, and he replied, "No, I am glad I killed the white son of a bitch, and if I had it to do over, would do it again."

At the trial, defendant testified in his own behalf and said that Lyle did the cutting, and that the knife belonged to Lyle and not himself. He admitted fully and circumstantially his presence at the scene of the homicide, and that he and Lyle were together and had the altercation with Stillwell and Stewart, but says Stillwell called Lyle "a black son of a bitch," and then Lyle stabbed him. In rebuttal his character for

morality was shown to be very bad. In other words, his reputation was that of "a tough," and he had on another occasion stabbed a man named Hurley.

The court instructed the jury on murder in the first and second degrees; on the credibility of witnesses, and reasonable doubt, and the presumption of innocence, and refused to instruct on manslaughter in the fourth degree, and self-defense.

I. Learned counsel for defendant assign as error the failure to instruct on manslaughter in the fourth degree. Their theory of the case is that the defendant did not do the cutting; that deceased was stabbed by Lyle, who was only guilty of manslaughter in so doing, because he was provoked thereto by the vile epithet applied to him by the deceased, and in addition thereto that there was evidence tending to show that Stillwell and Stewart were the aggressors.

We are of opinion that there was no evidence in the case upon which to base an instruction for manslaughter. Stewart, who was present, testified that Stillwell was doing nothing, when Martin stabbed him. He says Lyle was on the outer edge of the sidewalk nearer to him, Stewart; and in this he is thoroughly corroborated by the witness Perkins, the paper hanger and painter, who says not only that Martin stabbed Stillwell but that "Stillwell was doing nothing." The defendant was innocent not only of murder, but of manslaughter, as well, if his testimony is to be credited. He had not jostled deceased; deceased had applied no epithet to him. He did not return and enter into a difficulty with deceased, but stood by, a mere spectator, in no manner aiding, assisting or counseling in the killing of Stillwell, but, on the contrary, urging Lyle to come away.

If defendant's testimony is to be the basis for the instruction, it is most clear that it would have been

error to have instructed on manslaughter as to him, and on the other hand, if we are to predicate an instruction on the evidence in behalf of the state, there was no provocation, at all, not even of epithets, save that of the witness, Mary Marshall, who did say that Stillwell cursed both of the negro boys, and called them "black sons of bitches." It is now well settled law that mere words of reproach, however grievous, unaccompanied by an assault or battery, will not constitute such a provocation as to reduce a homicide from murder to manslaughter. Upon no view of the evidence would an instruction for manslaughter have been proper.

II. There was no error in giving the fifth instruction. It was favorable to defendant. It permitted the jury to find defendant guilty of murder in the second degree if they should believe Stillwell had, by opprobious epithets and abusive words, provoked defendant into a violent passion. The objection now urged against it that it did not submit, in connection with the abusive words, the question of provocation provoked by actual violence, is manifestly untenable. There was no such evidence in the case. Defendant's own testimony refutes the claim. The instruction was evidently predicated on Mary Marshall's evidence, which the jury evidently did not credit.

III. Counsel concede that the seventh instruction is correct as an abstract proposition of law, but doubt its propriety in this case, but we think it was entirely appropriate.

IV. In the ninth instruction the court instructed the jury, among other things, that "if, upon the consideration of all the evidence, you conclude that any witness has sworn willfully falsely as to any material matter involved in the trial, you may reject or treat as untrue, the whole or any part of such witness' testimony," and this is assigned as error. It is not error

for the trial court to instruct the jury as to the rules for weighing testimony, and no rule of law is better settled than that which permits a jury to utterly disregard the evidence of a witness if they believe he has committed perjury. In this case either the defendant or the witnesses, Perkins and Stewart, have knowingly testified falsely. There is no middle ground. The contradiction is clear and sharp, and not such as witnesses might honestly differ about. In such a case this instruction is proper.

V. Counsel further insist that the court of its own motion should have instructed the jury as to the effect of a reasonable doubt on the degree of defendant's guilt; in other words, that if the jury had a doubt as to the degree of defendant's guilt, they should return a verdict for a lower degree. We think it evident, however, that such an instruction would have been prejudicial to the defendant and unauthorized by the law. The jury, under the instruction of reasonable doubt as given by the court, was not authorized to convict the defendant of any grade of homicide if they had a reasonable doubt as to his guilt of that particular grade; but under the modification desired by counsel, they would have been justified in finding defendant guilty of murder in the second degree, merely because they had a reasonable doubt as to his guilt of murder in the first degree. This negative manner of putting it is sanctioned by no authority. The jury were properly instructed that they must find affirmatively all the elements of murder in either degree, beyond a reasonable doubt, before they convict of either grade. The fact that they have a reasonable doubt as to the higher grade requires an acquittal of that grade, and if they have a reasonable doubt of the lower grade, they must acquit of that also. This the instruction told the jury, and it was clearly correct.

VI. The sixth instruction has repeatedly received the approval of this court. *State v. Talbott*, 73 Mo. 347; *State v. Tabor*, 95 Mo. 585; *State v. Underwood*, 57 Mo. 40.

VII. The defendant complains that the state was permitted, over his objection, to ask his witness, Washington, how many times he had been in the county jail on sentences for crime. An examination of the record does not disclose the ground of this objection, but, waiving the absence of a proper objection, there was no error in permitting the question and answer to it. It was most clearly asked for the purpose of honestly discrediting the witness, and it was unnecessary, under the circumstances, to produce the record of convictions. *State v. Miller*, 100 Mo. 606; *State v. Taylor*, 118 Mo. 153; Wharton's Crim. Ev. [9 Ed.], sec. 474.

VIII. After the defendant had testified that he recognized the knife offered in evidence, and had seen it at the picnic in the hands of Ernest Morgan, and that he himself had never had it in his hands until after he was imprisoned, charged with the crime, he was asked if it was found in his mother's house, if he knew how it got there. An objection was made and sustained. Counsel now say they do not contend that the defendant saw Lyle have the knife, but that he would have testified to conduct tending to show that Lyle placed the knife in his mother's house; but no such offer as this was made to the court at the time the question was denied, and as defendant had disavowed ever having the knife in his possession, if he desired to throw the guilt on his codefendant, he should have disclosed his purpose. The mere refusal to hear the answer is not alone sufficient to constitute error. It is the duty of the party alleging error to establish it, at least *prima facie*. *Aull Savings Bank v. Aull's Adm'r*, 80 Mo. 199;

*Jackson v. Hardin*, 83 Mo. 175; *State ex rel. v. Leland*, 82 Mo. 266; *Hickman v. Green*, 123 Mo. 165.

Nor was there any error in refusing to permit defendant to tell what Lyle said to him. It was no part of the *res gestæ* and Lyle was not a party to the record, nor was it a contradiction of the testimony of any witness for the state.

IX. The witness Willet testified that he knew Eli Stillwell, the deceased; that on the night of the homicide he was going to his home about 11 o'clock; that he got off the Troost avenue street car, near the corner of Eighteenth and Harrison streets, and as he started down the street he heard Stillwell cry "police," "police," but thinking he was drunk, walked across the street from him, until he saw him fall between two planks on the side walk and heard him say "I am fainting," "I am gone," "catch me." Witness then ran to him and they carried Stillwell into a saloon on the north side of Eighteenth street, just across the street from where Stillwell fell. As the witness come up to the fallen man, another man who had also came to him said: "Look how that man is cut," and Willet saw the blood on him, and immediately someone said: "Better go after a doctor," and the witness says he ran a block and a half to Dr. Hardin's residence and rang the bell and the doctor put his head out of the window above and witness told him "a man was dying up there," and asked him to come, and received the reply that he could not, and ran back to the saloon, and said: "The doctor can't come," and in a moment or so, an officer, who had arrived in his absence, in the presence of the witness Willet, asked Stillwell, "Do you know who did it?" and he answered: "Yes; two negroes, one a little yellow fellow." No one had made any statement in his presence as to who did it. The trial

court admitted this statement as a part of the *res gestæ* and it is now assigned as error.

"The *res gestæ* may be [therefore] defined," says Dr. Wharton, "as those circumstances which are the automatic and undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist, as we will see, of sayings and doings of any one absorbed in the event, whether participant or bystander; they may comprise things left undone as well as things done.   *   *   *   In other words, they must stand in immediate causal relation to the act—a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself." 1 Wharton's Law of Evidence, sec. 259.

This statement of the general rule has received the indorsement of this court and of the supreme court of New Jersey in *Hunter v. State*, 40 N. J. L. 495, and of the supreme court of Pennsylvania in the recent case of *Com. v. Werntz*, 29 Atl. Rep. 272.

It has been wisely said: "The *res gestæ* are different in different cases; and it is not perhaps, possible to frame any definition which would embrace all the various cases which may arise in practice. It is for the judicial mind to determine, upon such principles and tests as are established by the law of evidence, what facts and circumstances, in particular cases, come within the import of the terms." *Lund v. Inhabitants*, 9 Cush. 42.

As indicating what facts bring different cases within the rule, it is perhaps well enough to recall some of the best known. A leading one, and one cited with approval by this court, is that of the *Com. v. M'Pike*, (1849), 3 Cush. 181. M'Pike was indicted for manslaughter, for stabbing and killing his wife. At the

trial the attorney for the commonwealth introduced evidence that the wife, between twelve and one o'clock on the night of the alleged homicide, ran from her room, where her husband, the defendant, was, to the room occupied by the witness in the same house in a story above that of the defendant and there knocked, crying murder.  On being let in, the deceased wanted the occupant to call a doctor and a priest saying that she was killed.  The witness saw deceased was wounded and that blood was running upon the floor and started immediately for a physician.  On opening the door *she met defendant at the door*, and pushed him aside and went out.  Another witness who heard the woman crying murder started to the room but met the first witness who warned her not to go, for defendant would kill her, and this last witness immediately went for a watchman and coming back went immediately up to the room where deceased was and found her on the floor bleeding profusely.  She asked for water and to go for a physician.  She said that John (meaning the defendant) had stabbed her.  The defendant objected to the declaration of his wife that he had stabbed her but the court admitted it and the supreme judicial court of Massachusetts affirmed the ruling.

The decision in that case was cited, quoted, and followed in *Brownell v. Railroad*, 47 Mo. 239.  In that case an engineer was killed in consequence of a switch being left open on defendant's track.  In an action by the wife the question arose as to the admissibility of a declaration of the engineer, made immediately after the accident when he was restored to consciousness and just before he died, in which he said, "If it had not been for that man who left the switch open," and it was held admissible.  In that case the decision of the supreme court of the United States in *Insurance Co. v. Mosley*, 8 Wall. 397, was also cited with approval.

In this last mentioned case the question was whether Moseley came to his death by an accident inflicting personal injury or whether he died of disease. To show his death was caused by accident, his wife and son were allowed to testify that he left his bed in the night and when he came back said he had fallen down stairs, and this ruling was affirmed by the supreme court of the United States, and the decision was cited with approval in *Insurance Co. v. Hillmon*, 145 U. S. 296.

In *State v. Sloan*, 47 Mo. 604, the defendant offered to prove that whilst the surgeons were dressing the wounds of Moore, for whose murder he was being tried, and immediately after the shooting took place, Moore, in speaking about the matter said that "Sloan was not in fault, that he had drawn on the difficulty by attacking him, and that if his pistol had not hung when he went to draw it he would have killed him." The trial court rejected it as no part of the *res gestæ*, but this court reversed the case, holding that the evidence was admissible as a part of the *res gestæ*. And to the same effect is *Entwhistle v. Feighner*, 60 Mo. 214; *Harriman v. Stowe*, 57 Mo. 93.

In *Com. v. Hackett*, 2 Allen, 136, the facts were very similar to those at bar. There the evidence tended to show that the defendant suddenly approached the deceased in the night and stabbed him and ran away. At the moment the stabs were inflicted the deceased cried out, "I'm stabbed." John Butler, a witness for the state, testified he heard these words and went at once to Gillen, the deceased, and was the first person that got there. He was asked: "When you got to Gillen what did he say, if anything?" and he answered "I'm stabbed—I'm gone—Dan Hackett has stabbed me." The defendant urged that this was mere narration, uttered in his absence and essentially

The State v. Martin.

hearsay. But the court, through Chief Justice BIGE-
LOW, answered, "If it was a narrative statement, wholly
unconnected with any transaction or principal fact, it
would be clearly inadmissible. *But such was not its
character.* It was uttered immediately after the alleged
homicidal act, in the hearing of a person who was
present when the mortal stroke was given, who heard
the first words uttered by the deceased and who went
to him after so brief an interval of time that the
declaration or exclamation of the deceased may fairly
be deemed a part of the same sentence as that which
followed instantly after the stab with the knife was
inflicted.    *    *    *    The true test of the competency of
the evidence is not    *    *    *    that it was made after
the act was done, and in the absence of the defendant.
These are important circumstances, entitled to great
weight, and, if they stood alone, quite decisive. But
they are outweighed by the other facts in proof,
from which it appears that they were uttered after the
lapse of so brief an interval, and in such connection
with the principal transaction, as to form a legitimate
part of it, and to receive credit and support as one of
the circumstances which accompanied and illustrated
the main fact."

In *Crookham v. State,* 5 W. Va. 511, two witnesses
testified they heard deceased calling for help, after
dark, and on inquiring of him what was the matter,
he answered that somebody was killing him, and was
cutting him with a knife. "Charles Crookham has
stabbed me, he has killed me; for God's sake run for
the doctor." The defendant moved to exclude the
words, "It was Charles Crookham," or "Charles
Crookham has stabbed me," but it was held that they
were admissible as a part of the *res gestæ,* citing *Hill's
case,* 2 Gratt. 594.

These cases sufficiently indicate the manner in

The State v. Martin.

which the courts apply the general principle which admits or excludes evidence as a part of the *res gestæ*, and are clearly distinguishable from those cases in which the narrative unconnected with the principal facts is universally rejected.

Here we have a citizen going to his home in the night. He is assailed by a ruffian and stabbed to the heart. Instinctively he cries, "Police, Police," and is seen to stagger and cry out," "I'm fainting," "I am gone," "Catch me," and falls to the ground. The witness who testified to these facts runs to his relief, finds him covered with blood. Knowing that a physi-.cian resides only a block and a half down the street, he runs to his house, rings the bell and at once is answered the doctor can not come. He runs back to the injured man. In this short interval, an officer has arrived and finding the man prostrate and bleeding to death, inquires, "Who did it," and is answered by the dying man, "Two niggers; one a little yellow fellow." No one has made any suggestion. As said by Judge BIGELOW, this last statement may well be deemed a part of the sentences he uttered immediately after the fatal stab was inflicted. They are not mere narrative. They are uttered in the presence of a witness who has heard his cries for the police, who has seen him stagger and fall covered with blood and went at once to his relief, and found him bleeding to death. It was not, then, a mere narrative unsupported by the principal facts, but it is in direct connection with it and illustrative and explanatory of it. No sensible man would reject such evidence in his own affairs. We think the court committed no error in holding it competent.

But upon another ground it is perfectly clear that the admission of this evidence constitutes no ground

for reversal of this case. This declaration only went to the extent of identifying the persons who committed the act. They were not even named and the dying man did not attempt to say which one actually did the stabbing, nor did he attempt to exonerate himself. His declaration simply accounted for the presence of Martin and Lyle and their participation in this affair, and this is not a disputed fact in the record. The defendant took the stand and testified fully and circumstantially to his presence at the scene of the homicide, to the presence of Lyle; to the stabbing of a man; so that, if we be in error in holding the declaration of Stillwell admissible, it was most clearly harmless in view of all the other evidence, and could not possibly have injured defendant.

X. Another assignment is based on the testimony of officer Edwards. This officer arrested Lyle and was cross-examined by defendant's counsel fully as to having obtained from Lyle the first information of Martin's connection with the homicide. He was asked in regard to Lyle's statements, whether he had not said he had been at Martin's house that morning; and, in redirect-examination, the state's attorney simply asked the witness to tell just what Lyle did say to him. To this question no grounds of objection whatever are stated. It was nowhere objected that Lyle's statements were not evidence against his codefendant or that it was not proper cross-examination of the matter elicited by the cross-examination.

The incompetency of the declaration made by Lyle after his arrest as against Martin, was perfectly apparent when defendant elicited it, but he saw fit to waive all objections in his effort to obtain evidence in his own behalf and it is too late to raise that objection now in this court for the first time. *Carney v. Carney*, 95 Mo. 358, 359.

Several other unimportant questions were asked which were rejected, but the grounds are nowhere stated, nor their purpose indicated. We have given each of them due consideration, and are of opinion that they constitute no material error.

Upon the whole, the case was carefully tried. The defendant was defended by counsel who were zealous in his behalf. Without cost to himself, he has been allowed to have a complete transcript of the record certified to this court. We have patiently gone through the record and find no error therein. The evidence fully sustains the charge that without any provocation he willfully, deliberately, premeditatedly and of his malice aforethought stabbed and killed an unoffending citizen, and the judgment of the criminal court is affirmed, and ordered that the sentence pronounced by the law be executed on Thursday, December 13, 1894. BURGESS and SHERWOOD, JJ., concur.