STATE OF MISSOURI, Respondent, v. JAMES E. MURPHY, Appellant.

### St. Louis Court of Appeals, December 3, 1901.

1. **Criminal Law:** LARCENY, DEFINITION OF. Larceny is the felonious taking of the personal goods of another with the intent on the part of the thief to convert them to his own use.

2. ———: ———: EVIDENCE: PRACTICE, APPELLATE. And in the case at bar, the trier of the fact found that defendant got possession of Trautman's money by a trick and fraud with the felonious intent to keep it and did keep it, and this court will not disturb the finding of fact.

3. **Bill of Exceptions:** PRACTICE, TRIAL: PRACTICE, APPELLATE. In order to entitle appellant to have the ruling of the court, on the materiality of testimony, reviewed in an appellate court, he should have stated to the trial court and preserved in the bill of exceptions what he expected to prove by the witness.

Appeal from St. Louis Court of Criminal Correction.—*Hon. Willis H. Clark*, Judge.

AFFIRMED.

### STATEMENT OF THE CASE.

The defendant was tried and convicted of petit larceny in the St. Louis Court of Criminal Correction. After an unavailing motion for new trial defendant duly appealed. The errors assigned are that the evidence is insufficient to warrant the conviction and that the court erred in excluding competent evidence offered by the defendant.

State v. Murphy.

The evidence of the prosecuting witness in chief is, as follows:

James Trautman, being duly sworn, testified:

"Q. Do you know the defendant?

"A. Yes.

"Q. When was the first time you ever saw him?

"A. The fifteenth of July, 1900.

"Q. How came you to meet this man?

"A. I was walking down Market street alone. I was a stranger in town and met a young man who asked where some firm was located, and I told him I was a stranger and knew nothing about the town. He then said: 'Is that so? I am a stranger, too.' He asked me if I had heard about the big explosion or accident at the tunnel on Eighth street. I told him 'No.' He said from what he had heard it was an awful thing and he was going down to see it. I told him I had nothing to do and would go with him. So we started down Market street together and turned on Ninth street to go to Chestnut street. He told me that he wanted to meet a friend in a saloon on Ninth and Chestnut street. I told him 'I will go in with you, as I am tired and will sit down and wait if your friend has not come.' We walked up to the bar together and he asked if some one had been there, but I forgot what name it was. He invited me to drink with him, but I told him I did not care to drink anything, and he told me to have a cigar."

"Q. Did you take a cigar?

"A. No, sir; we then turned from the bar to sit down when we saw this gentleman sitting at a table.

"Q. Who, this defendant?

"A. Yes, sir.

"Q. What was he doing?

"A. He had a big cloth with a lot of numbers on it laying on the table and a few little pins on sticks. We walked

over to the table; another gentleman walked up and asked him to cash a ticket. He then took the ticket and looked at it and my friend who was with me spoke up, saying that he had a ticket too, and if he would cash it. He took that also, and looked at it and said that he could not cash it, as it was a partnership ticket, and he must bring his partner with him. My friend then said that it was his brother who owned the ticket in partnership with him, and that his brother had left town. Then this defendant told him that it was a double ticket and that he would have to bring his brother with him before he could cash the ticket; that it was against the rules of the game to pay the winnings of a double ticket to one man. My friend said that his brother was out of town and he did not know what he could do. The defendant said he was satisfied, as my friend's partner being a brother, there would be no trouble, and that if he had some friend in town, that is some confidential friend, whom he would not be afraid to trust with the money providing the ticket should win—he should bring him to represent his brother on the other end of the ticket, and he would give them the drawing that the ticket called for, and if the ticket won anything he would divide the winning between them according to the rules of the game. Then my friend spoke up and said that I was a confidential friend and he would trust me with it, should the ticket win, and asked me if I would represent his brother. I told him, 'Yes, I will accommodate you.' Then the defendant told my friend to knock the sticks over. He knocked them over with a pencil and they added the numbers up and the defendant said we won $20 apiece. He gave my friend $20 and he gave me $20. My friend put the $20 in his pocket and I went to give my friend the $20 that the defendant had given me, and he told me to put it in my pocket and keep it. I told him I did not want it. He said that I should wait and give it to

him on the outside.    Then I caught on that it was a gambling scheme and threw the $20 on the table.

"Q.    Then what happened?

"A.    Well—he took my money and said he wanted to count it.

"Q.    Who, the defendant?

"A.    Yes.

"Q.    Well, how much money?

"A.    $26.00.

"Q.    Then what did you do?

"A.    I told him to give me my money.    He said: 'Knock the sticks over first and see what number it comes.' I knocked them over with a pencil.    He counted up the numbers and said it was a black one and that I had lost; if it had come a red one, he said, I would have won.    Then I told him I could not afford to lose the money and that I wanted him to give it back.    He said that if I had won his money I would have kept it, and he would do the same with me.    I told him 'No,' if I'd have won his money I would have given it back, as I was only joking.    I wasn't playing for keeps.    He said that I had lost and that he would not give it back under any consideration.

"Q.    Then what happened?

"A.    I told him that if I did not get my money I would go and get a policeman and have him arrested.    He said he did not care—it was gambling, and I was much to blame as he was, and if I wanted an officer he would get one for me.

"Q.    Well, what did you do then?    Did he get an officer?

"A.    No; I went out to look for one myself, and found this officer here, Mr. Hickey, and I told him I had been robbed.    We started back to the saloon and we met the defendant and a small fellow I did not know.    Then the officers wanted both of them."

On cross-examination, after witness had said he had the twenty dollars in one hand and his pocketbook in the other, and was trying to straighten the money out so as to put all his money together in his pocketbook, the following occurred, by counsel for appellant.

"Q. How could you be straightening out this $20 bill with you other money so as to put it in your pocketbook while this bill was lying on the table, as you said you had thrown it on the table? How could you have it in your hand after you had thrown it on the table?"

(Witness does not answer.)

"Q. Answer that question?"

Judge Clark: "Don't answer it."

Mr. Johnston: "I would like to have an answer to that question, your Honor, as it is a proper question, and I have a point in mind that I want to lead this witness to make."

Judge Clark: "The witness need not answer that question. He has already answered it about eight times. I have other cases on the docket to try to-day. I understand this case now without any further testimony."

To which action and ruling of the court defendant then and there duly excepted.

On further cross-examination the following was brought out.

"Q. How many times did you knock the sticks over after you had put your $26 down?

"A. Once.

"Q. Well, what did you knock the sticks over for after you had put the $26 down?

"A. Why, to see what number it would come. He told me to knock them over to see how much I would get. If it would come red I would win and he would give me my money and more, too, but if it would come black I would lose.

"Q. Well, what did you knock them down for?

"A.　Well, I had to.

"Q.　Nobody forced you to, did they?

"A.　No."

And the following occurred:

"Q.·　Now, is it not a fact that you were gambling of your own free will and lost your money, instead of him taking it away from you?　You said that you caught on that it was a gambling game.　What business did you have to knock the sticks over or having anything to do with the game?　You must have been gambling; was you or was you not gambling?"

(Witness does not answer.)

Judge Clark:　"There is no use going further. I understand the case; we have other cases on the docket and can not afford to lose so much time on this case."

To which action and ruling of the court defendant then and there duly excepted.

On direct examination officer Hickey testified as follows:

"Q.　Did you arrest this man?

"A.　Yes, sir.

"Q.　Where and when?

"A.　On Chestnut street, between Ninth and Tenth, on July 15, 1900.

"Q.　What did you arrest him for?

"A.　This man here complained to me that he had been fleeced in O'Farrel's saloon on Ninth and Chestnut.　I walked toward the saloon with him, when we met this defendant and the complainant said he was the man who had fleeced him; so I arrested him and another young man who was with him.

"Q.　What did the defendant say when you made this arrest?

"A.　He said he did not know the plaintiff.

"Q.　He said he had never seen him before—did he?

"A.   Yes, sir; he said said he never saw him before."
No instructions were asked or given.

*Charles T. Noland* for appellant.

The facts do not show a case of larceny.   The prosecuting witness having parted with his money upon a bet or wager, there was no unlawful "'taking." There being no evidence of any trick amounting to a fraud in law there was no trespass.   Without a trespass there can be no larceny.

No brief for respondent.

BLAND, P. J.—Larceny has been defined as the felonious taking of the personal goods of another with the intent on the part of the thief to convert them to his own use. That defendant took the money of Trautman and converted it to his own use is not left in doubt from the evidence. Whether he stole it or won it on a game of chance may be a debatable question.   The trier of the fact, however, found that he stole it, that is, that he got possession of it by a trick and fraud with the felonious intent to keep it and did keep it and there is substantial evidence to support this finding, hence this court will not disturb the finding on the ground of want of sufficient evidence.

It is not disclosed by the record what the appellant expected to prove had the witness been permitted to answer the questions which the court ruled he need not answer.   We are, therefore, unable to determine whether the answers of the witness would have been favorable or unfavorable to the defendant, or whether the answers would have been material or immaterial testimony.   Appellant should have stated to the trial court, and preserved in the bill of exceptions, what he expected to prove by the witness in order to entitle him to

have the ruling of the court, on the materiality of the testimony, reviewed in an appellate court. State v. Hodges, 144 Mo. 50; State v. Martin, 124 Mo. 514; Aull Savings Bank v. Aull, 80 Mo.199; Bank of Pleasant Hill v. Wills, 79 Mo. 275; State v. Ragsdale, 59 Mo. App. 590.

No reversible error appearing in the record the judgment is affirmed. All concur.