## H. W. CURREY, Respondent, v. JOPLIN SAVINGS BANK, Appellant.

### Kansas City Court of Appeals, May 25, 1903.

**Bills and Notes:** FRAUDULENT TRANSFERS: NOTICE: EVIDENCE: INSTRUCTIONS. On a review of the evidence and instructions it is held the judgment of the trial court, in favor of which all presumptions prevail, was based on the fact that the defendant bank paid certain certified checks with notice of the fraud by which they were procured from the original payee.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

AFFIRMED.

*McAntire & Scott* for appellant.

(1) John Carlson clothed Williams with apparent title, and the law should protect the bank on the ground of estoppel even if the instruments were non-negotiable. Coudry v. Vandeburg, 101 U. S. l. c. 575-6; Coudry v. Vandeburg, 154 U. S. 659; Looney v. District of Columbia, 113 U. S. 261; Laughlin v. District of Columbia, 116 U. S. 489-491; Preston v. Witherspoon, 109 Ind. 464; Hirsch v. Norton, 115 Ind. 343; Dymock v. Railroad, 54 Mo. App. 409; Babcock v. Bank, 118 Ind. 213;

Whitemore v. Obear, 58 Mo. 280-286; Bank v. Bank, 71 Mo. 183; Cummings v. Hurd, 49 Mo. App. 140; Neuhoof v. O'Riley, 93 Mo. 164; McNeal v. Bank, 46 N. Y. 325; Lee v. Turner, 89 Mo. 489; Henry et al. v. Evans, 97 Mo. l. c. 59; Lee v. Turner, 15 Mo. App. l. c. 214; Bank v. Genocalieo, 27 Mo. App. 666; Trust Co. v. Inv. Co., 65 Fed. l. c. 278; Bridgens v. Bank, 66 Fed. 14, l. c.; Ferrell v. Trust Co., 74 Fed. 774, l. c.; Leonard v. Marshall, 82 Fed. 401, l. c.  (2)  Even though Williams obtained the certificates of deposit by fraud or was guilty of false pretense in obtaining them, yet if the bank was innocent of the fraud it should be protected.  Lee v. Wilkins, 79 Mo. App. 163; Strauss & Co. v. Hirsch & Co., 63 Mo. App. 195; Bank v. Wade, 73 Mo. App. 485; Courtial v. Tielkemeyer, 72 Mo. App. 374; Hamilton v. Marts, 63 Mo. 178; Mayer v. Robinson, 93 Mo. 114. (3)  The evidence was clear and explicit to the effect that defendant bank paid the certificates without notice, hence it proved all it should in order to be discharged. Courtial v. Lowenstein, 78 Mo. App. 489.

*Galen & A. E. Spencer* for respondent.

(1)  Carlson was robbed by means of an unlawful scheme, conceived and carried out by the "Buckfooters." The result was prearranged and certain. Williams got the certificates from Carlson, agreeing to return them in a couple of hours. He intended all the time to and did keep them. This constituted larceny. State v. Hall, 85 Mo. 669; State v. Murphy, 90 Mo. App. 548; U. S. Murphy, McArth. & Mack, 375; 48 Am. Rep. 754; Defrese v. State, 3 Heisk. (Tenn.) 53; 8 Am. Rep. 1; Miller v. Com., 78 Ky. 15; 39 Am. Rep. 194; People v. Shaw, 57 Mich. 403; 58 Am. Rep. 372; 24 N. W. 121; Doss v. People, 158 Ill. 660; 49 Am. St. Rep. 180; 41 N. E. 1093; Com. v. Lannan, 153 Mass. 287; 25 Am. St. Rep. 629; 26 N. E. 858; State v. Woodruff, 47 Kas. 151;

27 Am. St. Rep. 285; Beasley v. State, 138 Ind. 552; 46 Am. St. Rep. 418; 38 N. E. 35; State v. Skilbrick, 25 Wash. 555; 66 Pac. 53; 87 Am. St. Rep. 784, and note. Hence Williams got no title. (2) The evidence, from whatever point viewed, clearly shows a plot to bring Carlson to Webb City with a draft, and to steal that draft from him. The law will not select certain parts of a transaction, being a larcenous conspiracy as a whole, and hold that part honest, disregarding the remainder of the transaction. U. S. v. Murphy, Mac-Arth. & Mack, 375; 48 Am. Rep. 754.

BROADDUS, J.—The petition upon which plaintiff seeks to recover is in two counts. The first is a cause of action based upon a deposit made by one John Carlson on the 22nd day of April, 1902, and the right of action thereon assigned to plaintiff; the second count is for money had and received.

The undisputed facts are: That on the 22nd day of April, 1902, said Carlson, in company with one R. H. Williams, went to defendant bank in Joplin where Carlson, who was identified by Williams, deposited a draft on a St. Louis bank for $3,000, and received from the bank four certificates of deposit, viz: Two for $1,000, and two for $500, each. These certificates read as follows, except as to the different sums stated in the two latter, viz: "Certificate of deposit. Joplin Savings Bank. $1,000. Joplin, Mo., April 22, 1902. John Carlson has deposited in this bank one thousand ($1,000) dollars with interest at 4 per cent if left six (6) months, no interest after time specified. George W. Layne, President." On the 24th day of April, following, Carlson assigned and delivered said certificates to said R. H. Williams, who, on the same day, presented them to the defendant bank which paid him the amount therein called for. It is admitted that plaintiff paid nothing for the deposit, and that he took the assignment for collection only.

The evidence conclusively shows that the said Williams obtained the transfer of said certificates in one of two ways, viz.: First, by the device of a pretended loan for a short time; or, secondly, that he paid Carlson for them who wanted the money to bet on a prize fight.

It appears from the testimony that there was an athletic association located at Webb City, Missouri, popularly known as the "Buckfoot Gang," whose practice was to have what were known as "fake" foot races and prize fights, the object of which, according to Williams, was to "separate the 'sucker' from his money." The members of the association bet their money so as to always win. The proceeds of the winnings were divided among the members. They were highly successful, and many persons were induced by their wiles to bet on the races and fights brought about by the gang, and no instance was given in which they were not the winners. John Carlson, who was a Swede, lived at Spring Valley, Illinois, and was at the time engaged in the saloon business. The evidence tended to show that one Ed Morris, a negro prize fighter, in collusion with the so-called "Buckfoot Gang," induced said Carlson to go to Webb City and participate in the betting to be made on a contest between said Morris and another negro prize fighter by the name of Long, upon representation that Williams wanted to bet on him, Morris, but that as the arrangement was to beat the other members of the gang, he was afraid to bet in his own name and wanted a stranger to do the betting for him; that he (Carlson) would get a part of the winnings which were assured, but that in order to keep down suspicion among the other members, he must bring with him a draft for $3,000, to show apparent good faith on his part. Carlson agreed to the arrangement, procured the draft for $3,000, and in company with one Horner and Morris, went to Webb City. It was shown that shortly after Carlson arrived at Webb City he was introduced to Williams, at which time the former exhibited to the lat-

ter his draft for $3,000.    Thereupon, according to his testimony, Carlson was induced by Williams to go to Joplin and deposit his draft, Williams accompanying him.    He further says that Williams persuaded him to take in exchange for the draft the four certified checks hereinbefore mentioned.    That while making the deposit, George W. Layne, the defendant bank's president and cashier, and Williams "smiled and shook their heads."    Carlson was unknown to the bank, but, as before stated, was identified by Williams.

On the evening of the day after the deposit, the prize fight was to be had.    The plaintiff's evidence tends to show that Williams gave Carlson about $2,000 to bet for him on Morris.    Ed Ellis, another member of the "gang" was betting on Long and put up the money against that bet by Carlson for Williams.    During the time while the betting was in progress, Ellis got suspicious, or, rather, so pretended, that all the money that had been wagered was not in the hands of Williams, who was also the stakeholder.    This alleged suspicion was communicated by Williams to Carlson with a request that he assign the certificate of deposits to him so that he would be able to satisfy Ellis that all the money was on hand, Williams at the same time confessing with apparent good faith to Carlson that he was short of the amount he should have in his hands, and that he would return the certificates in a short time.    Morris lost the fight, which result the evidence tends to show was prearranged.    Whereupon Carlson wanted Williams to return to him his certificates of deposit.    But Williams put him off with some excuse and took the certificates to Joplin to defendant bank and cashed them.

Williams testified that Carlson was doing his own betting and that he furnished him the money for that purpose, and that Carlson transferred to him the certificates in consideration for the money so furnished; and there was other testimony to the same effect.

It is undeniable that the business and methods of

the "gang" was notorious in the county and defendant's cashier admitted that he had heard of its dishonest practices. He denied, however, that he knew that Williams had anything to do with the "gang" and claimed that his acquaintance with them was slight. But it was shown that prior to the occasion in question here, that Williams and one Boatwright, one of the most notorious members of the organization, had business dealings in the way of deposits with the defendant amounting to many thousand dollars. One Ola McWhirt, who resided with Boatwright, had a credit on the books of the bank for about $28,000, in the total, made from various deposits. She testified that she did not have any interest in these deposits and all that she had to do with the business was to endorse her name on the certificates, sometimes at the instance of Williams, and at other times at the instance of Boatwright; that she had never at any time been in the bank; and that she never received any certificates of deposit from the bank, but received them through Williams and Boatwright, and that she did not know Layne, the cashier. Layne testified that the McWhirt woman came to the bank, but he misdescribed her personal appearance. There was evidence tending to show that the time Carlson obtained the certificates of deposit that he expected to use them as he was looking after mining lands.

The court sitting as a jury found for the plaintiff and defendant appealed.

The theory upon which plaintiff sought to recover was that the manner in which Williams got possession of the certificates of deposit in law amounted to a felony, hence, that Williams got no title; that defendant took them with knowledge of the means by which Williams had obtained them from Carlson; and that if it was proved that Williams got the certificates from Carlson by furnishing him money to bet, the transfer was void. No instructions were asked or given on the part of the plaintiff. Seven were given upon the part of

the defendant and four refused, including one in the nature of a demurrer to the evidence.

We are enabled to infer from these instructions in part the theory upon which the court decided the issue, viz: First, that if Carlson negligently indorsed the certificates to Williams and the bank paid the money to him before any demand made upon it, the finding should be for the defendant. Second, that notwithstanding the certificates were obtained by fraud and deceit from Carlson, yet if plaintiff, before he received the assignment of the cause of action, had notice of the payment to Williams, the finding would be for defendant. Third, if Carlson informed defendant at the time the certificates were issued that he intended to transfer them, and that he afterwards sold or loaned them to Williams, the finding must be for the defendant. Fourth, if the certificates were obtained by fraud or deceit and Carlson received from Williams $3,000, and bet the same on the prize fight and lost, then the finding would be for the defendant. Upon all the theories of the case thus presented in their instructions the court found against defendant.

The only ground upon which the action of the court can be upheld is, that it must have found that the certificates were obtained from Carlson by means of a trick practiced by Williams, and that the bank cashed them with notice of that fact. Merely because they were obtained in such manner would not authorize a recovery, on the ground that the transaction was in law a larceny and that thereby no title passed, as the authorities hold in State v. Hall, 85 Mo. 669; State v. Murphy, 90 Mo. App. 548; Defriese v. State, 3 Tenn. 53, and other cases. For there are exceptions to the rule, as, for instance in a case "where the owner of property confers upon another an apparent title to or power of disposition over it, he is estopped from assailing his title against an innocent third party, who has dealt with the apparent owner in reference thereto, with-

out knowledge of the claim of the true owner.'' Walters v. Tielkemeyer, 72 Mo. App. 371; McNeil v. Bank, 46 N. Y. 325. And the evidence brings the case here within the exceptions to the rule, as Carlson, by his indorsement clothed Williams with the apparent ownership of the certificates. Nor does the case come within the construction put upon the gaming statute in Williams v. Wall, 60 Mo. 318, and other cases, for the certificates were not bet upon the result of the prize fight.

As there was evidence tending to show that the bank paid the certificates with knowledge of the fraudulent manner in which they were procured from Carlson, the plaintiff contends that the finding should be sustained.

And we might legitimately infer from the action of the court in refusing the following instruction asked by the defendant that the court did find that the bank had knowledge of the deceit practiced upon Carlson by Williams, viz: ''The court sitting as a jury finds that there is no evidence in this case that defendant had any knowledge or want of authority or title in R. H. Williams to collect the money called for by the instruments executed by the Joplin Savings Bank to John Carlson, and the court further declares the law to be that under the undisputed evidence in this case defendant, the Joplin Savings Bank, in good faith paid the money called for by each of said so-called certificates of Deposit.''

As there was no error in refusing the defendant's instruction, and as there was evidence tending to show that the defendant's cashier was in collusion with the ''Buckfoot Gang'' and Williams to defraud the plaintiff's assignor, Carlson, every presumption prevails to sustain the finding. Cause affirmed. All concur.