**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Willard TERRY, Defendant-Appellant.**

**No. KCD 30053.**

Missouri Court of Appeals,
Western District.

April 30, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 11, 1979.

---

William F. Bauer, Tim L. Warren, St. Joseph, for defendant-appellant.

Paul R. Otto, Jefferson City, for plaintiff-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

Appellant was convicted upon a trial by jury of first degree robbery and of rape. In accordance with the verdict, he was sentenced respectively to 30 years and 25 years imprisonment by the Department of Corrections, to be served consecutively. He appeals. We affirm.

We will briefly state the facts, omitting the ugly details which are unnecessary for our purpose:

At about 3:00 o'clock in the morning of July 23, 1978, Sharon (the rape victim) was in her apartment with three guests—Randy Moore, her boy friend, Raymond Belcher and Gary Bashor. A man later identified as appellant came to the door and asked if any of them knew where a person named McDonald lived. None of the four was able to give him the information, and he left.

Fifteen or twenty minutes later the man reappeared at the door. Belcher and Bashor had left, and Sharon had gone to the bathroom. Moore answered the door. The man asked to borrow ice. Moore went back to ask Sharon if there was any ice to be given to him. On Moore's return to the front room, the man produced a gun. He demanded Moore's money and got about $450 from him. He then got about $50 or $60 from Sharon.

He then forced Moore into a back room of the apartment and required Sharon, under threat of death, to accompany him. He ushered her outside and into a nearby field where he raped her twice.

Other facts will appear as the opinion progresses.

We will take in order defendant's points of error:

*Prosecutor's remark in argument relating to adulterous interracial living arrangement.* Linda Shouse, a white woman, had testified in defendant's behalf that she lived with defendant, a black man, and that defendant had been with her when the offense was alleged to have occurred.

In argument the prosecuting attorney made the following statement: "And the same thing for Linda Shouse. Again, does she have a right to be believed when common sense, common experience tells you that a woman who has lived with a man for two years, no doubt with the kind of moral certainty or the kind of moral conviction that it would take for a white man—for a black man to live with a white woman—"

Here he was interrupted by an objection. Defendant's counsel urged that the prosecuting attorney was "inciting racial prejudice". The prosecuting attorney explained to the court, outside the jury's hearing, that the thrust of his argument "was that a woman who has the conviction, the moral conviction, the ability to stand up to pressure on the outside to live with a man of a different race . . . that she would certainly have the strength to come up on the stand and testify for him. He certainly means a great deal to her."

The court refused to declare a mistrial, a ruling now assigned as error, but sustained the objection and instructed the jury to disregard the argument. "I had some difficulty in following it," said the court, "but whatever it is, you're instructed to disregard it. The racial characteristics of the people involved here have nothing to do with this case one way or the other."

The prosecutor continued: "This woman indeed has a great deal of moral conviction, indeed has a great strength, in that she is willing to forego a great deal, and we simply say to you to take that, because you have to take that into consideration as to their testimony on the stand."

The trial court having found the prosecutor's argument was improper, we cannot say the court's action was not sufficient in sustaining the objection and admonishing the jury to disregard the remark. He was well within his discretion in refusing a mistrial. We are reminded that mistrial is a drastic remedy, to be granted only when the trial court believes the prejudicial effect of the error cannot be obviated by more conservative measures. To this judgment the trial court brings a sense of the ambience of the trial. He can assess the impact upon the jury of the improper argument. Unless we can discern upon the record an abuse of discretion, we accept the trial court's ruling as correct. *State v. Frankoviglia*, 514 S.W.2d 536, 539 (Mo.1974); *State v. Raspberry*, 452 S.W.2d 169, 173 (Mo.1970).

*Alleged misstatement of the evidence in prosecutor's argument.* A portion of the hospital record of the examination of the rape victim was read in evidence:

"Patient states—This is complaints."

"Patient states she was raped during armed robbery. No other physical trauma."

In his final argument the prosecutor said: ". . . Mr. Dale said that the doctor's report shows no mention of bruises or abrasions. On the other hand, it does not show that there are not bruises or abrasions." Defense counsel objected that this was a misstatement of the evidence. The court's adverse ruling is assigned as error.

The report is open to some construction. The report did not say, as defense counsel stated in his objection, that there was no other *evidence* of physical trauma. The word "trauma" may mean either the blow or other insult, or the resultant condition. Furthermore, the statement in the report, "No other physical trauma", could be interpreted as a part of the patient's report of the incident, rather than as a finding by the examining physician that there were no marks of injury on the witness's person. The attorneys disagreed, apparently before the jury, on the meaning of the statement in the report. The trial court did not discern, nor do we, any bad faith on the part of the prosecutor. The court in effect referred the jury to the exhibit itself, to decide for themselves what was meant by the statement. No prejudice could have resulted. We have no criticism of the court's disposition of the incident, and defendant's point is disallowed. *State v. Taylor*, 496 S.W.2d 822, 824 (Mo.1973); *Collins v. Cowger*, 283 S.W.2d 554, 561 (Mo.1955).

*Allowance of identification evidence.* Appellant complains of the admission of the identification testimony of witnesses Moore and Belcher and of Sharon, claiming that the lineup and showup procedures at which appellant was first identified were impermissibly suggestive, were conducive to irreparable misidentification, and therefore violated his Due Process rights.

Moore and Belcher had been asked by Lieutenant Pasley to come to the police station to give information about the crime. During the forenoon of the day of the occurrence, as they were sitting in an outer office, defendant was brought in handcuffs through the office by three officers. He was being taken to Inspector Schott's office, which adjoined and opened off the outer office where Moore and Belcher were sitting. A pickup order had been issued for defendant, but his arrival at that time and the encounter with Moore and Belcher were unplanned. Moore and Belcher simultaneously and spontaneously identified the defendant as the person who had been at Sharon's apartment the night before.

■ That afternoon defendant was lined up with four others and Sharon was brought in to view the lineup. She immediately identified defendant. Without describing each person in the lineup in detail, we can say that there was no gross disparity in the appearances of the subjects, and that the police evidently made a good faith effort to line up persons somewhat similar in appearance. Defendant was wearing blue jeans and a white T-shirt, which he was wearing at the time of his arrest. (Sharon said he had on blue jeans and a light blue T-shirt at the time of the crime.[1]) The others were dressed in comparable style.

■ The point of condemning suggestive lineup and showup procedures is that a witness whose grasp of the culprit's appearance is tenuous and uncertain, because of a lack of opportunity to see him for sufficient time in adequate light, may be misled into a wrong identification which becomes irreparable. If, however, the court is convinced that the identifying witness had sufficient opportunity at the time of the crime to fix in his mind's eye the appearance of the culprit, then the witness will not have been misled even by a suggestive lineup or showup. Therefore the court looks at the "*totality of circumstances*" to see if there is "a substantial likelihood of irreparable misidentification". *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 *et seq.* (1972).

1. Clothing similar to apparel worn at time of offense does not indicate impermissible suggestiveness. *State v. Arnold*, 528 S.W.2d 164 (Mo. App.1975).

■ In this case we are entirely satisfied that there was no such "very substantial likelihood of irreparable misidentification." Here Moore, Belcher and Sharon had all seen the defendant when he came to the apartment door at 3:00 a. m.—two witnesses placed him a step inside the door—and had asked if they knew where "McDonalds" lived. There was sufficient light that he could plainly be seen. On his return 15 or 20 minutes later to ask for ice, when he committed the robbery and abducted Sharon, he was inside the lighted apartment. Moore and Sharon—Belcher and Bashor had left—saw him quite plainly for some period of time. They were able to give an accurate description of the defendant which enabled the police to apprehend him. As pointed out above, Moore and Belcher, when they saw defendant at the police station later in the morning, and Sharon, when she saw him in the lineup that afternoon, were positive and unhesitating in their identification.

All the factors, therefore—the opportunity to view, the degree of attention, the accuracy of the description, the witnesses' level of certainty, and the time between the crime and the confrontation—make for an identification which would overcome a good measure of undue lineup and showup suggestiveness, even if that were present. The court, therefore, quite correctly overruled the defendant's motion to suppress in-court, lineup and showup identification, and left them to the jury to evaluate. *Manson v. Brathwaite, supra*; *Neil v. Biggers*, 409 U.S. at 201, 93 S.Ct. 375; *State v. Simmons*, 559 S.W.2d 557, 561 (Mo.App.1977). In this connection, we commend the following statement from the majority opinion of Mr. Justice Blackmun in *Manson v. Brathwaite*, 432 U.S. at 116, 97 S.Ct. at 2254:

> Short of that point [i. e., a very substantial likelihood of irreparable misidentification], such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American

juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

■ *Refusal to allow defendant to show complaining witness's venereal disease.* One point remains: Defendant says the court erred in making an *in limine* ruling denying defendant the right to show by extrinsic evidence that the victim, Sharon, had gonorrhea at the time of the rape. The relevance of such evidence has not been shown to us. It would certainly not tend to prove any issue in the case. It would not be admissible on the issue of the rape victim's credibility. Although invited by the trial judge to do so, defendant could suggest no theory of relevance. The trial court was entirely correct in refusing without a showing of relevance to allow the unfortunate woman's humiliation to be compounded. *State v. Yowell*, 513 S.W.2d 397, 403–4 (Mo. banc 1974); *State v. Lee*, 404 S.W.2d 740, 749 (Mo.1966); *State v. Kain*, 330 S.W.2d 842, 845 (Mo.1960).

Defendant points to § 491.015(1), subparagraphs (1) and (2) as allowing this evidence. But not so. This section comes into play when prosecutrix claims rapist gave her a certain disease. The statute then allows proof of other specific sexual activity to show another source or sources of the disease.

Defendant in his brief here, in an attempt to make the evidence relevant, says that it might have been shown that the disease was highly contagious and that defendant didn't catch it, and therefore he was not the rapist. Defendant did not claim to the trial court that he could produce any such evidence, and does not claim so here.[2] The evidence is by no means admissible on the basis of such hypothetical connecting evidence. *State v. Lee*, 404 S.W.2d 740, 749

---

2. *Cf. People v. Fong Chung*, 5 Cal.App. 587, 91 P. 105, 107 (1907), where prosecution had already placed the fact of venereal disease in evidence, the defendant had produced medical evidence that he had never had the disease, and the question improperly excluded concerned whether the prosecutrix already had the disease at the time of the alleged rape.

(Mo.1966); *State v. Martin*, 124 Mo. 514, 28 S.W. 12, 14 (1894).

The judgment is affirmed.

All concur.