# THE STATE v. SIMON AND JACOB HENDRICKS, Appellants.

Division Two, March 17, 1903.

1. **Reasonable Doubt:** CERTAINTY. The law does not require the State to establish the guilt of defendant "so clearly and convincingly that the jury are convinced to a moral certainty, that he is guilty as charged". It simply requires it to establish his guilt beyond a reasonable doubt.

2. **Circumstantial Evidence:** REFUSAL OF ARGUMENTATIVE INSTRUCTION. Where the court has instructed the jury "that the facts and circumstances in evidence should be consistent with each other and with the guilt of defendants and inconsistent with any reasonable theory of defendant's innocence", it is not error to refuse one asked by the defendant which is substantially the same except that its language is stronger and inclined to be argumentative. Argumentative instructions should not be given.

3. **Repetitions:** CAUTIONARY INSTRUCTION: DUTY TO GIVE. Although the court properly may refuse an instruction intended to caution the jury in their consideration of the repetition by witnesses of statements made to them by defendants concerning their guilt, as being too much in the nature of comment upon the character of the evi- dence, and as being argumentative, yet the asking of the improper instruction clearly suggests the giving of a proper one on the sub- ject, and it is error for the court not to give a proper one where such repetitions are in evidence.

4. ————: DYING DECLARATIONS: CAUTIONARY INSTRUCTIONS. Dying declarations of the deceased are not to be classed with simply casual conversations of the defendant. The rule for giving a cau- tionary instruction as to the consideration to be given repetitions of statements made by defendant does not apply to the repetition of dying declarations.

5. **Dying Declarations:** STATING DAYS ON WHICH MADE. Instructions on the subject of dying declarations should not name the days on which they were made. Only such statements of deceased should be admitted in evidence as are in fact dying declarations; and to the jury should be submitted the question of whether such dying declara- tions were in fact made, and if made, the rule that should guide them as to their weight and influence in reaching a verdict.

State v. Hendricks.

6. **Incompetent Evidence**: ADMISSION: REVIEW: PRACTICE. If the appellant desires the appellate court to review the action of the trial court in admitting evidence, he must object to the testimony when offered and if his objection is overruled he must save an exception, and that objection and exception must appear in the bill of exceptions. But as this case is to be retried for other errors, the court notices the testimony which it is contended was erroneously admitted, whether objections and exceptions thereto were taken and saved or not; but this is done simply for the guidance of the trial court on the retrial of the particular case, and with a distinct statement that the long established rule is not thereby to be considered relaxed or evaded.

7. **Dying Declarations**: ADMISSIBILITY. The fact that deceased did not die for some little time after his formal dying declaration had been written and signed, does not affect its admissibility. If at the time of making it he believed that death was impending and had abandoned all hope or expectation of recovery, so much of it as is competent is admissible in evidence.

8. ——: CORROBORATIVE TESTIMONY. Consistent conversations with deceased, from a time soon after the assault was made up to the time of his death, are not competent for the purpose of corroborating the dying declarations of deceased.

9. **Res Gestae**: STATEMENTS OF DECEASED. Statements of deceased made to his wife soon after the assault, to be admissible as a part of the *res gestae*, must not only recount such occurrences as are contemporaneous with the assault itself, but be so closely allied to it, as, in contemplation of law, to be a part of the act itself. And where the difficulty occurred near the house of deceased, and after he was assaulted and his assailant had fled from the scene, "he finally struggled to his feet and walked on to his home and went in at the gate and walked up to the door and either his wife opened it for him or he opened it", and on entering his wife inquired what was the matter and he replied, "They have made their word good," the defendants "pounded me out there", her testimony detailing the statements then made to her by deceased in which he narrated the entire details of the difficulty is incompetent as a part of the *res gestae*.

Appeal from Caldwell Circuit Cort.—*Hon. J. W. Alexander,* Judge.

REVERSED AND REMANDED.

*Cross & Sons* and *Johnson & Son* for appellants.

A sufficient ground was not laid for the introduction of the declarations of Hipes as to the character of the assault made upon him.   State v. Simon, 50 Mo. 370. Dying declarations are based on the grounds of necessity and because of the supposed solemnity of the occasion.   They may be impeached in any of the modes by which the evidence of the deceased could have been impeached had he been alive and testified on the stand. 10 Am. and Eng. Ency. Law, 384.

*Edward C. Crow,* Attorney-General, and *C. D. Corum* for the State.

(1)   Where the means by which the defendants deprived the deceased of life, be unknown, the indictment may so state the fact.   Kelley's Criminal Law, sec. 484; 65 N. C. 453.   (2)   This court will not examine the questions as to whether the trial court committed error in the admission and exclusion of testimony, for a good and sufficient reason. The only reference in the motion for a new trial to that feature of the trial is stated thus:   "Because the court erred in excluding legal, competent and relevant evidence offered by the defendants and because the court erred in admitting illegal, incompetent and irrelevant evidence over the objections of the defendant."   In most instances the objections made were to testimony that was immaterial and not harmful to defendant.   In all other instances the objections made were not specific and the attention of the court was not, therefore, called to the ground upon which the objection was based.   Objections must be specific and an objection, without more, does not avail anything.   State v. Johnson, 76 Mo. 121; State v. John, 153 Mo. 445; State v. Brown, 168 Mo. 472.   These statements in a motion for a new trial are too general.   State v. David, 159 Mo. 534; State v. Brown, 168 Mo. 474.   (3)   The instructions asked by the defendant and refused by the court were properly

State v. Hendricks.

refused. They contained a request that the jury receive with great caution the verbal declarations of the defendants and the deceased. They were a comment on the evidence and a statement to the jury of its sufficiency and weight. A judgment of conviction will not be reversed where such instructions are refused. State v. Clump, 16 Mo. 387; State v. Bell, 70 Mo. 634; State v. Hundley, 46 Mo. 421. (a) Instruction number 3 offered by defendants and refused by the court, was properly refused, because the jury had already been instructed as to the weight they should give the dying declarations of defendant in instruction 14 given on behalf of the State. We think that this instruction was more liberal to the defendant than he had the right to demand. State v. Reed, 137 Mo. 138; State v. McCannon, 51 Mo. 160; State v. Vansant, 80 Mo. 67. (b) Instruction 2, asked by defendant and refused was properly refused, on the ground that there was no evidence on which to base it. And instruction 1 was properly refused, because the jury had already been fully and properly instructed on reasonable doubt. The instruction on reasonable doubt was a proper declaration of the law. State v. Duncan, 142 Mo. 456. (4) More than twenty instructions were given. We have not been furnished with the brief of defendants and we can perceive no error in any of the instructions given, and think they covered the whole case. Indeed, the case could have been covered in all essential features by very few instructions. The defendants had a fair trial and the only wonder is that the punishment assessed by the jury was so surprisingly light. The judgment of conviction should stand.

## STATEMENT.

On the 10th of July, the grand jury of Caldwell county, Missouri, returned an indictment against the defendants for murder in the second degree. They were charged in that indictment with having killed one

Vol 172 mo—42.

William C. Hipes, on September 29, 1900. The defendants were jointly indicted and jointly tried. The first trial resulted in a hung jury, the second trial resulted in the conviction of both defendants of manslaughter in the fourth degree, and their punishment assessed separately at imprisonment in the penitentiary for a period of two years.

The facts, briefly stated, are these: On the evening of the 29th of September, 1900, the deceased was shopping in the business part of the town of Kidder, and at an early hour of evening started home. The defendants were observed in town at about that hour and one of them was seen to look through a window into a store where deceased was at that time. Before the deceased had reached his residence he was assaulted and knocked down by two men. A young lady, whose home was situate on the street just opposite the place of the occurrence of the assault, heard the deceased say, "Why do you jump on me?" And she saw two men strike the deceased, who was doing what he could to defend himself. She heard an unknown voice say, "Take him off," but she was unable to identify the person making this remark, as well as unable to identify the two men making the assault. After a considerable struggle between the parties another near-by window was raised and the noise attracted the attention of the two men and they ran away. The evidence shows that when the deceased reached his home, his ears and nose were bleeding and he had a wound on his head. It further shows that he, immediately on reaching his home, told his wife that Jake and Simon Hendricks were the parties who had beaten him. The deceased never recovered from the assault. It is shown that he complained continuously thereafter about a pain in his head and that he died in June, 1901. A post mortem examination revealed the fact that there was a small abscess on the outside of the skull in the locality of the wound and a much larger abscess on the inner side of the skull and immediately under the place where the blow was struck. It is shown that this abscess had suppurated

and afterwards saturated the brain.   The testimony on
behalf of the State tended to show that death was due
to this abscess, and that the wound was the immediate
cause of the abscess.   It was also testified by one of
the witnesses that on the morning after the deceased
had been assaulted, the defendant Jake Hendricks was
observed riding past the home of the deceased, and
that he turned from the roadway, and that he closely
scrutinized the ground where the assault occurred as if
looking for some lost article.   It was further shown
that during the afternoon of the same day, both de-
fendants were seen riding slowly by the home of the
deceased and one of them rode out of the main traveled
road and closely scrutinized the ground in the locality
where the assault was committed as if seeking some-
thing lost.   The other defendant kept on the main road.
On the Monday morning following the assault it was
discovered that the defendant Simon Hendricks had
an injured hand and that it was injured to such an ex-
tent that he was compelled to consult a physician for
its treatment.   The dying declarations of the deceased
were introduced in evidence.

The defendants, on their part, offered much testi-
mony, tending to show that the deceased had, on fre-
quent occasions, declared that he was ignorant as to
who made the assault on him and that he was unable
to identify such persons.   And the State, in rebuttal,
offered testimony to substantiate the dying declara-
tions.

There was other testimony by defendants tending
to show that they were not present at the time deceased
was assaulted.   The assault, from which it is charged
that the victim in that case died, was committed on
the 29th of September, 1900, and the deceased died on
the 22nd day of June, 1901.

As appellants challenge the correctness of the in-
dictment, we will insert it, omitting the caption.

"The grand jurors for the State of Missouri, sum-
moned from the body of Caldwell county, impaneled,
charged and sworn, upon their oaths, present that

Simon Hendricks and Jacob Hendricks late of the county aforesaid, on the 29th day of September, 1900, at the county of Caldwell, State aforesaid, then and there being, in and upon one William C. Hipes, then and there being, feloniously, willfully, premeditatedly, on purpose and of their malice aforethought, did make an assault, and with a dangerous and deadly weapon or weapons to these jurors unknown, which they the said Simon Hendricks and Jacob Hendricks then and there had and held in their hands, and against him the said William C. Hipes, then and there feloniously, will-fully, premeditatedly and of their malice aforethought, did strike and beat with the dangerous and deadly weapon or weapons aforesaid, then and there felon-iously, willfully, premeditatedly, on purpose and of their malice aforethought, did strike, wound and bruise him the said William C. Hipes, in and upon the head and face of him the said William C. Hipes, then and there with a dangerous and deadly weapon or weapons aforesaid, giving to him, the said William C. Hipes, in and upon the head and face of him the said William C. Hipes, several mortal wounds, of which mortal wounds aforesaid, the said William C. Hipes, from the 29th day of September, A. D. 1900, until the 22nd day of June, A. D. 1901, in the county of Caldwell and State of Missouri did languish and languishing did live, on which said 22nd day of June, A. D. 1901, the said William C. Hipes, in the county of Caldwell and State of Missouri, of the mortal wounds aforesaid, died. And so the grand jurors aforesaid, upon their oaths afore-said, do say, that the said Simon Hendricks and Jacob Hendricks him the said William C. Hipes, at the time and place aforesaid, in the manner and by the means aforesaid, feloniously, willfully, premeditatedly, on purpose and of his malice aforethought did kill and murder, against the peace and dignity of the State.''

FOX, J.—This cause was submitted to the jury upon the instructions given by the court (which, in the course of this opinion, will be given attention) and the

jury returned verdicts of guilty of manslaughter in the fourth degree, as to both defendants, fixing their punishment at two years in the penitentiary. They were both sentenced in accordance with the verdict. Motions for new trial and in arrest of judgment were filed, and by the court overruled, and the defendants in due time and form prosecuted their appeal to this court for review of the action of the trial court in the disposition of this case. When this cause was first submitted, the record was so defective that we could only review the record proper, as indicated by the opinion filed in this case February 3, 1903. That record has in all respects been corrected, the former opinion recalled, and we are now in a position to investigate the alleged errors complained of by appellants.

It is insisted by appellants, first, that the indictment is bad; second, that the court admitted incompetent and irrelevant testimony.

These constitute, in the main, the vital contentions in this cause. As to the first contention, as regards the indictment, we still adhere to the opinion heretofore announced in this case, that it contains all the necessary allegations to constitute the offense charged and is in harmony with approved precedents and forms. We have re-examined it and see no reason to change or alter the conclusion reached.

It is next insisted that the instructions of the court were erroneous. More than twenty instructions were given in this cause, and we will not burden this opinion by quoting all of them; but will only insert those of which complaint is made, and such other instructions as will indicate clearly the manner of presenting this case to the jury by the court.

Instructions numbered 1, 2, 3, 4, 5 and 6 were the usual and approved instructions, upon a charge of this character, and no complaint is urged as to them, hence there is no need of any comment upon them.

As we desire to make some reference to instruction numbered 8, in the course of this opinion, we here insert it:

"8. Evidence is of two kinds—direct and circumstantial. Direct evidence is where a witness testifies directly of his own knowledge to the main fact or facts to be proven.. Circumstantial evidence is proof of certain facts or circumstances in a certain case from which the jury may infer other connected facts which usually follow according to the common experience of mankind. Crime may be proven by circumstantial evidence as well as by direct testimony of eye-witnesses, but the facts and circumstances in evidence should be consistent with each other and with the guilt of the defendants, and inconsistent with any reasonable theory of defendants' innocence. If, therefore, you believe from the facts and circumstances proven in this case that the defendants, or either of them, on or about the 29th of September, 1900, at the county of Caldwell and State of Missouri, did feloniously, willfully, premeditatedly and of their malice aforethought make an assault upon one William C. Hipes, with a dangerous and deadly weapon, and with such dangerous and deadly weapon did feloniously, willfully and premeditatedly and of their or his malice aforethought inflict upon him, the said William C. Hipes, in and upon the head and face,. one or more mortal wounds or bruises, and from the effects of said wounds and bruises the said William C. Hipes, at the county of Caldwell and State of Missouri, within a year and a day thereafter, did die, then you will find such defendant guilty of murder in the second degree."

For the same reason, we quote instruction numbered 14:

"14. The court instructs the jury that if they believe from the evidence beyond a reasonable doubt that the deceased, William C. Hipes, on Wednesday, Thursday or Friday, preceding his death, made any statement relating to the assault alleged to have been made on him on the 29th day of September, 1900, as to the parties who made said assault or the manner in which assault was made, they will take and consider such statement as the dying declarations of said Wil-

liam C. Hipes and give them such weight as they may believe them justly entitled to in the light of all the other facts and circumstances disclosed in the evidence in the case. You should consider, however, that such statement or statements were not made in the presence of the defendants; that the declarant was not subject to cross-examination by the defendants or counsel for them; that the jury had no opportunity to observe the manner of the deceased at the time such statement or statements were made, and that he is not subject to prosecution for perjury if such statement or statements, or any part of them, are untrue. If the jury believe from the evidence that the deceased, William C. Hipes, at any other times or time, made statements contradictory of or inconsistent with such dying declarations (if the jury believe from the evidence such dying declarations were made) such contradictory or inconsistent statement should be considered by the jury in determining the weight to be given to said dying declarations."

The defendants then asked the court to give the following instructions, which the court refused to give:

"(4)  The court instructs the jury that the defendants are presumed to be innocent, and this presumption attends them throughout the progress of the whole trial, until it is overcome by evidence proving their guilt beyond any reasonable doubt, and before the jury can convict, the State must establish the guilt of the defendants so clearly and convincingly that the jury are convinced, to a moral certainty, that the defendants are guilty as charged."

The court modified and gave the above asked instruction as follows:

"The court instructs the jury that the defendants are presumed to be innocent, and this presumption attends them throughout the progress of the whole trial, until it is overcome by evidence proving their guilt beyond any reasonable doubt, and before the jury can convict, the State must establish the guilt of the defend-

ant beyond a reasonable doubt that the defendants are guilty as charged."

The defendants then asked the court to give an instruction, to which the court added the words italicised below, and which instruction was as follows:

"5. The court instructs the jury that when evidence fails to show any motive to commit the crime charged, on the part of the defendants, this is a circumstance in favor of his innocence, and, in this case, if the jury finds, upon a careful examination of all the evidence, that it fails to show any motive on the part of the defendants to commit the crime charged against them, then this is a circumstance which the jury ought to consider, in connection with all the evidence in the case, in making up their verdict. And in order to ascertain a motive, the jury will take into consideration all the evidence in relation with the association, relations and deportment toward each other *and the deceased,* together with all the other evidence in the case."

The defendants then asked the court to give the following instruction, which the court at the time gave:

"8. The court instructs the jury that in criminal cases, even when the evidence is so strong as to demonstate the probability of the guilt of the party accused, still, if it fails to establish, beyond a reasonable doubt, the guilt of the defendant in manner and form as charged in the indictment, then it is the duty of the jury to acquit."

The defendants then asked the court to give the following instruction, which the court refused to give:

"9. They are further instructed that the mere probabilities are not sufficient to warrant a conviction, nor is it sufficient that the greater weight or preponderance of the evidence support the theory of guilt, nor is it sufficient that, upon the doctrine of chance, it is more probable that the defendants are guilty than otherwise, but the State must go further to warrant the conviction of the defendants and must prove their guilt, clearly and conclusively, to such a moral certainty,

that there is no reasonable theory upon which they can be innocent.''

The court modified the above instruction asked by the defendants and gave it as follows:

''They are further instructed that mere probabilities are not sufficient to warrant a conviction; nor is it sufficient that the greater weight or preponderance of the evidence supports the theory of guilt; nor is it sufficient that, upon the doctrine of chance, it is more probable that the defendants are guilty than otherwise, but the State must go further to warrant the conviction of the defendants, and must prove their guilt beyond a reasonable doubt.''

The defendants then asked the court to give the following instruction, which was then and there given by the court:

''10.   The jury are further instructed that the presumption of the innocence of the defendants is not a mere form, which may be disregarded by the jury at pleasure, but that it is an essential and substantial part of the law of the land and binding on the jury in this case, and it is their duty to give the defendants in this case the full benefit of the presumption and to acquit them, unless they feel compelled to find them guilty, under the law and evidence, convincing them of their guilt beyond a reasonable doubt.''

The defendants then asked the court to give the following instruction, which the court refused to do, until it had struck out the words, ''if any,'' as underlined below:

''12.   The court instructs the jury that to them alone belongs the function of determining what weight, *if any*, shall be given to the dying declarations of the deceased, if any were made by him.   In weighing the declarations, the jury should take into consideration the facts that the defendants in this case were not present in person or by attorney when the statements were made, and that there was no opportunity for cross-examination of the deceased, and that there was no opportunity for the jury to observe the manner of the

deceased at the time he made the statement, so as to detect malice or feeling of revenge or other improper motive that may have influenced him, and that the deceased was not subject to prosecution for perjury if he made false statements. And if the jury find from the evidence that deceased had at other times made statements inconsistent with his dying declarations, these contradictory statements should be considered by the jury in weighing the dying declarations, and especially if such contradictory statements were made at a time when his blood was cool or his mind unaffected by passion or feelings of revenge.''

The defendants also asked the following instructions, which were refused by the court:

''1. The jury are further instructed that in order to warrant a conviction upon circumstantial evidence alone the testimony must be of such a nature that it is not only altogether inconsistent with the theory of the defendant's guilt, but utterly and absolutely inconsistent with any reasonable theory of their innocence; that is, that all the circumstances in evidence must not only be inconsistent with the theory of the defendants' guilt, but the jury must also be satisfied beyond a reasonable doubt that all the facts are absolutely incompatible with the innocence of the accused upon any rational theory, and incapable of explanation upon any other reasonable theory, than that of their guilt.

''2. The jury are further instructed that the statements of the witnesses purporting to be repetitions made by the defendants are liable to much imperfection and mistake, through a lack of clear and exact expression of the meaning by the party making the statement, and also through a misunderstanding by the witnesses of the statement actually made, or by them unintentionally altering or failing to remember some of the expressions actually used, whereby an effect is given to the statement in variance with what the party actually did say, and they are, therefore, instructed that while such purported repetitions of statements claimed to have been made by the defendants are admissible in

evidence, yet they should be received and considered by the jury with great caution, and subject to close scrutiny, and given such consideration as they are entitled to in view of all the other evidence in the case.

"3.   The jury are further instructed that the statements of the witnesses purporting to be repetitions of the dying declarations of the deceased are liable to .much imperfection and mistake, through a lack of clear and exact expression of the meaning of deceased, and also through a misunderstanding of the statements actually made by the deceased, or by them unintentionally altering or failing to remember some of the expressions used by deceased, whereby an effect is given to the dying declarations at variance with what the deceased actually did say, and they are therefore actually instructed that while such repetitions of the dying declarations of the deceased are admissible in evidence, yet they should be received and considered by the jury with great caution and subject to close scrutiny and given such consideration as they are entitled to in view of all other evidence in the case."

Treating these instructions in their regular order, our attention is directed to error complained of in the modification of instruction numbered 4.   It will be observed that this was an additional instruction, requested by defendants, to that already given by the court on the subject of doubt.   The last paragraph of the instruction requested, contains this language: "*the State must establish the guilt of the defendants so clearly and convincingly .that the jury are convinced, to a moral certainty that the defendants are guilty as charged.*"   The court simply made this change in that instruction: for the words "so clearly and convincingly that the jury are convinced to a moral certainty," it substituted the words "beyond a reasonable doubt." There was no error in this modification, the court simply did what it was appropriate for it to do, made the instruction follow the old beaten path and conform to the recognized and approved form of instructions on that subject.

As to instruction numbered 5 which is quoted in full, the court only added "and the deceased." An examination of that instruction will demonstrate that this addition did not change the meaning of the instruction; did not in any manner alter its force or power; but on the other hand, the little change made it clear and less susceptible of misleading the jury. The contention of error as to that modification is without merit.

The same can be said as to the errors complained of in the modifications of instructions numbered 9 and 12. The changes were proper and in no way prejudiced the substantial rights of the defendants.

This brings us to the consideration of the instructions requested by defendants, and refused by the court.

Instruction numbered 1 as offered by defendants, it will be observed, was upon circumstantial evidence. As to the contention of error upon this instruction, we will say that the court fully covered that subject in instruction numbered 8 in which the attention of the jury were directly called to the rules that should govern them in reaching a conclusion upon circumstantial evidence. They were told in instruction 8, "that the facts and circumstances in evidence should be consistent with each other and with the guilt of defendants and inconsistent with any reasonable theory of defendants' innocence." The instruction requested was substantially the same, except the language was much stronger, and was inclined to be argumentative, which has never been approved by this court. There was no error in the court's refusing the instruction requested on this subject.

As to the refusal of the court to give instruction numbered 2, we will say that there was some evidence of witnesses respecting statements made by the defendants, or at least one of them. It is not for this court to say as to what influence the repetition of those statements, by witnesses, had upon the jury in reaching their verdict; but we do say that the defendants were entitled to an instruction tending to guide and govern them, in the consideration of this character of testi-

mony. The instruction, as will be observed by an ex-amination of it, was one of caution in the consideration of the repetition of statements made by the defend-ants. While these statements made by the defendants to other parties are competent, yet it has been ruled by this court, that an instruction as suggested by de-fendants should be given. In the case of State v. Mox-ley, 102 Mo. 374, the instruction, as applicable to this case, which was fully discussed by the learned judge, was in this form: "Although the jury may believe from the evidence that defendant made statements to various persons concerning the manner or circum-stances attending the death of his wife, still, if such statements were made casually, in the course of ordi-nary conversations, they should be considered with great caution, because of the liability of witnesses to forget or misunderstand what was really said or in-tended."

The court in that case quoted approvingly a dis-cussion of this point by Mr. Greenleaf: "On this point Greenleaf says: 'With respect to all *verbal admis-sions*, it may be observed that they ought to be received *with great caution*. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake, the party him-self either being misinformed, or not having clearly ex-pressed his own meaning, or the witness having misun-derstood him. It frequently happens also, that the witness, by unintentionally altering a few of the expres-sions really used, gives an effect to the statement com-pletely at variance with what the party actually did say.' " [1 Greenl. Ev. (14 Ed.), sec. 200.]

In the case of State v. Glahn, 97 Mo. 679, this court through BLACK, J., says: "It is usual and proper in cases like the present one to give the jury a cau-tionary instruction, directing them to consider the evi-dence of verbal statements and admissions of the de-fendant with care and caution, taking into considera-tion the liability of the witnesses to misunderstand and to misquote the words used.

We are of the opinion that the instruction requested was properly refused; its tendency is too much in the nature of a comment upon that character of evidence, and impresses us as being somewhat argumentative as to the weight to be attached to such testimony. While the action of the court in refusing the instruction was correct, still we are confronted with the question, as to what was the duty of the court in this respect, when the instruction, though improperly worded, clearly suggested the giving of a proper instruction.

In the case of State v. Lowe, 93 Mo. 571, there was an instruction offered, not in proper form, and the court through SHERWOOD, J., says: "If the instruction was not properly worded, it was the duty of the court, under our practice, to give a correct instruction on the point." The court in this cause, upon its refusal of the instruction offered by defendants, should have given a correct one. This was error. [State v. Davis, 141 Mo. 522; State v. Taylor, 118 Mo. 180; State v. Sidney, 74 Mo. 390.]

As to instruction numbered 3 requested by defendants, it will be noted that appellants insist that the same rule should apply to the repetition by the witnesses as of the statements of the deceased. This is not true; the same reasons do not exist for applying the same rule to the repetition of dying declarations. Dying declarations are not to be classed with simply casual conversations of the defendants. These declarations are of a more solemn character and are usually made only a short time before the witnesses are called upon to repeat them in the trial of the case. There was no error in the refusal of this instruction.

Instruction numbered 14, based upon the dying declarations made by the deceased prior to his death, is perhaps unhappily drawn. There is no necessity for the naming of the days upon which the dying declarations were made. As this case is to be retried, we suggest that the court admit only such statements of William C. Hipes, as, upon the proper foundation being laid, are in fact dying declarations. Then submit

to the jury the question as to whether such declarations were in fact made, and if made, the rule that should guide them as to their weight and influence in reaching a verdict. This instruction was substantially correct, except the criticism to which it is subjected as herein indicated.

This leaves us to the investigation of the last proposition in this case, as to the admission of incompetent and irrelevant testimony.

Upon an inspection of the original transcript in this case, we find that the errors complained of in this respect, in many instances, are not properly preserved in the bill of exceptions. It must be remembered that upon the admission of testimony, if the defendant desires to have the appellate court review the action of the trial court, in admitting it, there must be an objection to the testimony, and upon the objection being overruled, an exception must be taken at the time, and all this must appear in the bill of exceptions. As to some of the testimony the contention is preserved, but as this case is to be tried again, we will briefly notice all the testimony admitted, which appellants contend was inadmissible, regardless of the fact whether it is preserved or not. But we want it distinctly understood, that because we do this, it is not to be construed as an evasion of the long-established rule, that the points for review must be properly preserved. We simply discuss it, that the trial court may have the benefit of our views upon the re-trial.

We have examined very carefully all the testimony preliminary to the admission of the dying declarations. The physical condition of William C. Hipes, at the time he made the statements, is made clear by his attending physician, Dr. Cannon, which is supplemented by the testimony of his wife and other witnesses, who were with him before his death. This testimony indicated rather clearly that he had abandoned all hope of recovery. According to the testimony of his wife, he said frequently that he had to die; discussed some details which he desired to be attended to in respect to

his funeral.  Wm. Drury testified that in response to declaration to him "that he was looking a little brighter, he shook his head and said I have got to die." It is unnecessary to insert in this opinion all the testimony on that subject.  We have read it in detail and considered it carefully, and have reached the conclusion that no impartial mind can view this testimony in any other light than that Mr. Hipes, at the time of making the declaration, felt and realized that he was at death's door, and that dissolution was immediately about to take place.  The fact that he did not die for some little time after the declarations were made, does not affect the principle; it is not a question as to how long he lived after making the declarations; but at the time he made them, did he believe that death was impending, and had all hope or expectation of recovery vanished? This is the test; and is more clearly announced in State v. Kilgore, 70 Mo. 546. There was no error in the admission of the dying declarations.

As to the testimony of Mrs. Hipes, in reference to statements made to her by the deceased, after being assaulted, we have reached the conclusion that those statements were inadmissible, not forming a part of the *res gestae.* The difficulty occurred near the house of deceased.  He was assaulted, and as stated by Miss Cannon, "he finally struggled to his feet and walked on to his home and went in at the gate and walked up to the door and either his wife opened it for him or he opened the door." His assailants had fled from the scene of the difficulty.  Upon entering the house, his wife inquired of him "What is the matter?" He said, "They had made their words good, that Jake Hendricks and Simon Hendricks had pounded him out there." Then Mrs. Hipes is permitted to tell what her husband narrated to her, as to the entire details of the difficulty.  That we may fully appreciate the point upon this contention, we here insert the question and answer of Mrs. Hipes:

"Q.  Tell the jury what he said, if anything, all he said how the fight occurred?  A.  Well, he said

when he was coming from Colt's down, said he saw two men and first thought it was students, but when they came closer he knew they were not, for they had slouch hats and old clothes, and said it was Jake Hendricks and Simon Hendricks; when he spoke to them, they struck him on the nose, and that struck him down, and he said that made him see stars like, and then the next lick he thought they knocked him down, and when he came to he was on his knees and had his arm around one of them like that, and Jake was standing there and Simon was pounding him on his head. He struck Simon in the stomach and after that Simon told them to take him loose. He thought by the way his arm felt they struck him on the arm.

"Q. Who did he say said, 'Take him off?' A. Simon said that."

The trial court doubtless admitted this testimony on the theory that it was part of the *res gestae*. We are of the opinion that this was error. Facts to be admissible on the ground that they form part of the *res gestae* must not only be such occurrences as are contemporaneous with the main fact, but must be so closely allied to it as, in contemplation of law, to be a part of the act itself.

In the case of State v. Martin, 124 Mo. 514, Gantt, J., very ably and clearly discusses the identical question involved in this contention. In that case the witness saw the person who was assaulted; heard his cry for police, and saw him fall between two planks in the sidewalk, and heard him say, "I am fainting," "I am gone," "Catch me." Witness ran after a doctor, and in the meantime an officer appeared, and in the presence of the victim and another witness, asked the man who had been stabbed, "Do you know who did it?" and he answered, "Yes; two negroes, one a little yellow fellow." This statement was held, in that case, admissible as forming a part of the *res gestae*. The learned judge in discussing the admission of this testimony, quotes approvingly the definition of *res gestae* by Dr.

Vol 172 mo—43.

Wharton, who says: "The *res gestae* may be [therefore] defined as those circumstances which are the automatic and undisguised incidents of. a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time, more or less appreciable. They may consist, as we will see, of sayings and doings of any one absorbed in the event, whether participant or bystander; they may comprise things left undone as well as things done. In other words, they must stand in immediate causal relation to the act, a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself." [1 Wharton's Law of Evidence, sec. 259.] This statement of the general rule has received the indorsement of this court. In the Martin case the declarations of the person who was stabbed must be kept in mind. He first called for the police; then he exclaimed, "I am fainting," "I am gone," "Catch me." For the learned judge in that case bases his ruling as to the admissibility of the subsequent statement to the officer, who inquired of him, "Who did it?" and is answered by the dying man, "Two niggers; one a little yellow fellow," on the fact that this last statement could well be deemed a part of the sentences he uttered immediately after the fatal stab was inflicted.

Chief Justice BIGELOW, in case of Commonwealth v. Hackett, 2 Allen 136, says: "If it was a narrative statement, wholly unconnected with any transaction or principal fact, it would be clearly inadmissible."

Judge GANTT, in the case of State v. Martin, supra, after reviewing all the cases, very appropriately says: "These cases sufficiently indicate the manner in which the courts apply the general principle which receives or excludes evidence as a part of the *res gestae,* and are clearly distinguishable from those cases in which the narrative unconnected with the principal facts is universally rejected."

The statement of Mr. Hipes, after walking from where he was assaulted, through the gate into the

house, was purely narrative; in fact, the first thing he said, in answer to the question of his wife, "What is the matter?" was in reference to a threat that had been made by the defendants, at least from the expression, you would infer a threat, for he says, "They have made their word good." Then he proceeds to narrate minutely how he reached the place where the assault was made and all that was done by the defendants as well as himself. No one can read that statement and denominate it anything else than a narrative; it sounds just like the narrative of a difficulty months after it occurred. His statements must be taken as a whole; they cannot be separated and say one part of it is a part of the *res gestae* and the other is not. These statements should have been excluded.

We have now reached the last vital question in this case.

The State called numerous witnesses, as it is contended, for the purpose of corroborating the dying declarations of the deceased. These witnesses were permitted to testify as to conversations had with the deceased, prior to his death, from the next morning after the assault was made, up to the time of his death. The deceased lived for nearly nine months after the assault, mingled with his neighbors and friends, and had the various conversations testified to by the witnesses. The defendants, after the dying declarations were admitted, introduced a number of witnesses who testified that the deceased, prior to his death, on different occasions, said to them that he did not know who committed the assault. The State, upon the theory that this was an effort to impeach the testimony consisting of the dying declarations, offered the testimony as herein indicated to corroborate the declarations made by deceased. It must be remembered that the testimony offered by the defendants, that the deceased made statements inconsistent with the dying declarations, had a double purpose: first, to lessen the weight and influence of the declaration by the deceased; and, secondly, as affecting the testimony of those who re-

peated the declarations, as indicating the improbability of the deceased having made such statements.

The evident theory of the court in admitting the testimony of the State was, that after the testimony of the dying declaration, the State had the right to introduce the other conversations heretofore mentioned, as corroborating the dying declarations. We have reached the conclusion that this testimony as to these corroborative conversations was inadmissible.

While it is true the authorities are somewhat in conflict upon the question involved in this contention, we are of the opinion that the weight of authority is against the admission of such testimony. Dying declarations in the outset are rendered admissible by reason of necessity. They are only admissible when made under the full belief that death is impending and every hope of recovery has vanished. To extend the rule to the admission of all his declarations, on the ground of corroboration of his dying declarations, is a long step towards abolishing the rule as to the foundation in the first instance before they are admissible. If they are admissible to corroborate the dying statements, they are entitled to the same weight and force as the statements themselves.

In the case of State v. Grant, 79 Mo. 113, the court through SHERWOOD, J., announced the doctrine that if the testimony of a witness is attacked, it is then admissible to prove that the witness has made statements consistent with those made as a witness; the authorities are then cited to support the announcement of that doctrine. In the case of State v. Taylor, 134 Mo. 154, 155, the same learned judge very frankly recedes from the position in the Grant case, and says: "It seems the rule was stated too broadly in State v. Grant, 79 Mo. 113, on that point, although warranted by the authorities there cited, which, at least, Henderson v. Jones, 10 S. & R. 322 (overruled in Craig v. Craig, 5 Rawle [Pa.] 91); Coffin v. Anderson, 4 Blackf. (Ind.) 398, were founded, directly or indirectly on Lutterell v. Reynell, 1 Mod. 282, which long ago ceased to be au-

thority in England.  [Rex v. Parker, 3 Doug. 242.]''
In the Taylor case, the learned judge quotes approv-
ingly the rules announced by Greenleaf and Wharton:
''When speaking on this subject, Greenleaf says: 'But
evidence that he [the witness] has on other occasions
made statements similar to what he has testified in the
cause, is not admissible; unless where a design to mis-
represent is charged upon the witness, in consequence
of his relation to the party, or to the cause; in which
case, it seems, it may be proper to show that he made a
similar statement before that relation existed.    [1
Greenleaf Evid. (14 Ed.), sec. 469.]·

''Wharton says:  'When a witness is assailed on
the ground that he narrated the facts differently on
former occasions, while on re-examination it is com-
petent for him to give the circumstances under which
the narration was made, it is ordinarily incompetent to
sustain him by proof that on other occasions his state-
ments were in harmony with those made on the trial.' ''
[Whart., Crim. Evid. (9 Ed.), sec. 492.]

In the case of Craig v. Craig, 5 Rawle (Pa.) 91,
Chief Justice Gibson has the most logical discussion
of this question that has attracted our attention.   He
says: ''Though usually called confirmatory, these con-
sistent statements are universally agreed not to be ad-
missible in chief, but only to rebut other contradictory
statements; and if merely corroborative of the testi-
mony in chief, why should they not be received before
the credibility of the witness has been impeached?   As
rebutting, it can not be pretended that they disprove
the fact of contradiction, or that they remove the im-
putation of inconsistency.''   He held in the last cited
case  that the testimony was inadmissible.

To the same effect is the Parker case in which
the case of Lutterell v. Reynell, 1 Mod. 282, was over-
ruled, and it will be noted that the case of Coffin v.
Anderson, supra, was based upon this overruled case.

The North Carolina courts incline to the opinion
that the corroborative statements, as in this case, are
admissible.   The later cases seem to be applying it

only where the corroborative statements were made within a very short time after the difficulty occurred. We can not, with the views we entertain on this disputed question, follow these cases.

If these conversations are admissible as being corroborative, as was said in Craig v. Craig, supra, they are just as competent in chief as they are in rebuttal. When once admitted, they have the same force and influence as though they were made under such circumstances as would in fact make them dying declarations. These conversations should have been excluded by the trial court.

Entertaining the views as herein expressed, this case will be reversed and remanded, and it is so ordered.   All concur.